**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

HAYDEN REED, an individual                     Case No.: 25-cv- 24454

     Plaintiff,

v.

JOHN DOE(s) 1–13, individuals.

     Defendants.

## VERIFIED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

     Plaintiff, Hayden Reed ("Reed") by and through undersigned counsel, sues Defendants,

JOHN DOE(s) 1–13, and alleges as follows:

## PRELIMINARY STATEMENT

     1.    Plaintiff Hayden Reed had 4,855,702.06 tokens of TSUKA cryptocurrency,

valued at $166,800 USD, stolen by Defendants.  This was the vast majority of Mr. Reed's life

savings.

     2.    Defendants are members of "Inferno Drainer," a sophisticated criminal

organization that develops software-as-a-service tools and recruits scammers to conduct phishing

attacks, with the express goal of draining victims' cryptocurrency wallets.

     3.    Plaintiff brings this lawsuit to recover its stolen assets.

## THE PARTIES, JURISDICTION and VENUE

### Plaintiff

4.      Plaintiff Hayden Reed, is a natural person who is a citizen of the UK, resides in Australia, and is *sui juris*.

### Defendants

5.      Defendants JOHN DOE(s) 1–13 are as-yet unidentified individuals, business entities, and/or unincorporated associations, who collectively form part of the criminal conspiracy/enterprise known as Inferno Drainer, and who, on information and belief, are *sui juris*.

6.      At all times material hereto, Defendants have maintained – and continue to maintain as of the date of this filing – private cryptocurrency wallets and cryptocurrency exchange accounts in which Defendants hold all or a portion of the cryptocurrency stolen from Plaintiff.  Some of these stolen funds are located in two US-based exchanges: Foris DAX, Inc (dba Crypto.com) and Binance.

7.      Defendant JOHN DOE 1 is the individual who performed the illegal SIM card swap in a Florida phone repair shop, detailed *infra*.

8.      Defendant JOHN DOE 2 designates the individual associated with the cryptocurrency wallet 0x228bd0b1640c2f8d2eda9d7af1bec55bc49fb0a6. This is the main or anchoring Inferno Drainer wallet used for the theft in this case.

9.      Defendant JOHN DOE 3 designates the individual associated with the cryptocurrency wallet 0x80636DeF1134D300d81fE51440595131B3E52579. This is a wallet to which Plaintiff's cryptocurrency was transferred.

10.     Defendant JOHN DOE 4 designates the individual associated with the cryptocurrency wallet 0x57CD4542C0C997c3E7Ee77925069C08A248FCfe0. This is a wallet to which Plaintiff's cryptocurrency was transferred.

11.     Defendant JOHN DOE 5 designates the individual associated with the cryptocurrency wallet 0xb524979bEb95B261FF5EECFB2D063f5f9e2d9Bf8. This is a wallet to which Plaintiff's cryptocurrency was transferred.

12.     Defendant JOHN DOE 6 designates the individual associated with the cryptocurrency wallet  0x6F188d5FFCB60684e1E81aCbD10b52de42cf901b. This is a wallet to which Plaintiff's cryptocurrency was transferred.

13.     Defendant JOHN DOE 7 designates the individual associated with the cryptocurrency wallet 71QALeMW6L5NEcqNsu1JKzHqaie52BfTnTZ4hjqLeW2H. This is a wallet to which Plaintiff's cryptocurrency was transferred.

14.     Defendant JOHN DOE 8 designates the individual associated with the cryptocurrency wallet 0xEbC6fd7B731A4c553B5f437F3A0c77B0a2A281b1. This is a wallet to which Plaintiff's cryptocurrency was transferred.

15.     Defendant JOHN DOE 9 designates the individual associated with the cryptocurrency wallet 0x3846c5abD10F3931A0A99156Ba80D4ff10999E0A. This is a wallet to which Plaintiff's cryptocurrency was transferred.

16.     Defendant JOHN DOE 10 designates the individual associated with the cryptocurrency wallet 0xd109c7fB0c944A1426955C15cf0f24a67b7B304C. This is a wallet to which Plaintiff's cryptocurrency was transferred.

17.     Defendant JOHN DOE 11 designates the individual associated with the cryptocurrency wallet 0x1C769294936759AA94704bff957E8aEdE2D01687. This is a wallet to which Plaintiff's cryptocurrency was transferred.

18.     Defendant JOHN DOE 12 designates the individual associated with the cryptocurrency wallet 0x6742356649f80E02d311FEaa0e02ACDCA8835074. This is a wallet to which Plaintiff's cryptocurrency was transferred.

19.     Defendant JOHN DOE 13 designates the individual associated with the cryptocurrency wallet 0x45C4DcaEe2B75fe2a805468CF824fee331A530f0. This is a wallet to which Plaintiff's cryptocurrency was transferred.


**Jurisdiction and Venue**

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) as the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest, costs, and attorneys' fees, and is an action between citizens of different states.

21.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case involves federal questions under the Computer Fraud and Abuse Act (18 U.S.C. § 1030(a), et seq.) and RICO (18 U.S.C. § 1962, et seq).

22.     The Court has personal jurisdiction over the Defendants, via the Florida long-arm Statute, as they have committed torts in this district in furtherance of their criminal conspiracy. Specifically, the fraudulent scheme giving rise to this action was initiated in Florida when a friend of Mr. Reed took his cell phone to a repair shop located in this District. At that repair shop, an unlawful SIM swap was carried out, which allowed Defendants to gain access to the

friend's phone. Defendants then used that access to transmit a fraudulent link to Mr. Reed, resulting in the theft and draining of his digital assets. The Defendants' conduct was purposefully directed toward Florida and caused injury that arose from their contacts with this District. In addition, Defendants direct their business activities toward and conduct business with consumers throughout the United States, including Florida, through, at a minimum, the fraudulent website accessible via the internet and mobile devices within this District.

23.     Alternatively, the Court has personal jurisdiction over the Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2) because (i) Defendants are not subject to jurisdiction in any state's court of general jurisdiction; and (ii) exercising jurisdiction is consistent with the United States Constitution and laws.

24.     Venue is proper in this District pursuant to 18 U.S.C. § 1965(a) and (b), and 28 U.S.C. § 1391(b) and (c).  Venue is also proper as the court has personal jurisdiction over one defendant through minimum contacts with the state of Florida, there is no other district in which a court would have personal jurisdiction over all the co-conspirators, and because the facts show a single nationwide RICO conspiracy exists.

## **FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

**A. Defendants Execute a Cryptocurrency Theft**

25.     Plaintiff, Mr. Hayden Reed, is a natural person and citizen of Australia, residing in Gladsville, NSW, Australia.

26.     On or about April 6, 2023, Plaintiff was the victim of a phishing scheme orchestrated by Defendants.

27.     Prior to the theft, Patrick Stasiukiewicz, a friend of Plaintiff, took his cell phone to a repair shop located in the State of Florida. While the phone was in the possession of that shop, an unlawful SIM swap was carried out, granting Defendants unauthorized access to the Stasiukiewicz device and online profiles.

28.     Leveraging this unauthorized access, the Defendants posed as the Plaintiff's friend and sent Plaintiff a fraudulent hyperlink via the WhatsApp messaging application.

29.     The link invited Plaintiff to join an "exclusive" subgroup of a trusted cryptocurrency-focused WhatsApp community, one specifically for TSUKA[1] token holders.

30.     However, the hyperlink led to a fraudulent website controlled by Defendants and powered by the malicious "Inferno Drainer" toolkit.

31.     Believing the site to be legitimate, Plaintiff connected his digital wallet[2] to the webpage.

32.     Immediately upon doing so, Defendants drained the Plaintiff's digital wallet of 4,855,702.06 TSUKA cryptocurrency tokens.

33.     The Defendants' acts caused harm to the Plaintiff; the stolen TSUKA cryptocurrency was valued at $166,800 USD at the time of the theft.

**B. Defendants are Part of Inferno Drainer, an International Cryptocurrency Theft Organization.**

34.     Inferno Drainer ("Inferno") is a sophisticated cyber-fraud organization that develops scam software and conducts phishing attacks to steal cryptocurrency.

---

[1] "Dejitaru Tsūka" (デジタル通貨) is Japanese for "Digital Currency." Dejitaru Tsuka is commonly referred to as TSUKA.
[2] Wallet 0xaB7473Da0af4658AE2879cB641d82E7652721486

35.     Inferno's fraudulent acts began in approximately November 2022[3], continue to this day, and are reasonably expected to be ongoing.[4]

36.     Inferno has facilitated over 16,000 unique phishing domains, impersonated more than 100 cryptocurrency brands, and is responsible for stealing over $130 million in crypto assets.

37.     The Inferno organization develops and licenses a suite of criminal tools, including phishing website templates, fake NFT auction pages, malicious browser scripts, and automated cryptocurrency wallet-draining smart contracts.

38.     Inferno's operations are composed of two tiers of bad actors: Developers and Accomplices. The Developers create and license the suite of scam software, while a worldwide roster of Accomplices lure individual victims into the scam.

39.     Accomplices use various methods to lure victims, typically by posting links on trusted and well-known channels within social media platforms, such as X or Telegram. The crypto ecosystem thrives on a strong sense of community: traders, developers, and enthusiasts gather in real-time chat rooms on X (formerly Twitter), Telegram, Discord, and Reddit to swap tips, share project news, and discuss the projects they are interested in or have invested in. Accomplices exploit these communities by infiltrating communication channels, imitating respected members, or hijacking popular accounts to disseminate malicious links to tens of thousands of followers. These scams can also involve physically gaining access to devices through SIM swaps, which grant the perpetrators unauthorized control over a victim's phone

---

[3] Group-IB, Inferno Drainer: Analysis of a $90 Million Scam-as-a-Service Operation (Nov. 14, 2023), https://www.group-ib.com/blog/inferno-drainer-analysis/.
[4] Amid scrutiny, Inferno Drainer has continued operations while also partially rebranded itself as "Angel Drainer."

number and messaging applications. In Mr. Reed's case, Defendants used a SIM swap carried out at a Florida repair shop to compromise the phone of his friend, enabling Inferno to send Plaintiff a fraudulent hyperlink that triggered the theft of his cryptocurrency wallet.

40. The malicious links direct victims to websites that mimic well-known crypto project websites. These fraudulent websites are part of Inferno's suite of tools and are designed by Inferno Developers specifically to look identical to well-known websites or applications and trick victims.

41. When the victim visits the fraudulent website, they are prompted to connect their digital wallets. A digital wallet can be a software application (such as an app or browser extension) or a hardware device (like a USB stick) that stores the private keys necessary to access, send, and receive cryptocurrency on a blockchain. This connection request is often framed as a verification process or a means to receive airdrops of NFTs or other tokens, a common practice in the cryptocurrency space.

42. When a victim responds to this (ostensibly) routine connection, the website adds a hidden approval request. This request, <u>unknown to the victim</u>, grants access to a malicious "smart contract"[5] specifically designed by Inferno Drainer to steal the victim's cryptocurrency tokens.

43. The theft is accomplished by in the following manner: Inferno Drainer's smart contract is hosted in an "executor wallet" which upon detecting an "approval" from the victim's wallet, pays the upfront "gas fee" (a small payment in ETH required to record a transaction on

_____

[5] A smart contract is a widely-used type of program stored on a blockchain that automatically executes actions when specific conditions are met. It is most commonly used for routine purposes such as transferring payments, issuing NFTs, or handling loans, without the need for a middleman.

the Ethereum blockchain, similar to a filing fee). It then automatically "drains" or transfers all the cryptocurrency tokens from the victim's wallet to Inferno Drainer wallets.

44.     Often, the Inferno software itself automatically apportions the stolen assets, and the stolen funds are typically split with 80 percent being transferred to the Accomplice's wallet while 20 percent is transferred to the Developer's wallet.

45.     Other times, the split is not immediately visible on-chain. The absence of a visible split, however, does not mean the profit-sharing arrangement did not occur. Inferno Drainer markets several distinct "drainer" products, each of which can be configured to utilize a different workflow to route the stolen cryptocurrency tokens. For example, when the stolen asset is ETH (the Ethereum blockchain's native token) rather than an ERC-20 token (a programmable digital coin that can be sent, received, or traded just as easily as the blockchain's native currency (ETH), but represents its own distinct asset), the contract forwards the entire balance to the Accomplice, who is then expected to remit the Developer's 20% off-chain. Consequently, no split appears on the public ledger despite the underlying agreement remaining in force.

46.     On the other hand, 'Multicall' (a smart-contract function that aggregates multiple individual blockchain instructions (e.g., approvals, transfers, swaps) into a single transaction submitted to the network, reducing fees while obscuring the sequence of underlying actions from public review) drains may invoke a multicall wrapper that batches multiple operations into a single transaction. This wrapper routes the full stolen amount to a temporary wallet, from which the Accomplice conducts subsequent dispersals manually. Again, the 20% developer commission is paid later, often on a different blockchain or via a centralized exchange, rendering the split invisible to a single-chain trace. Thus, even when the 80/20 split is not visible on the public

ledger, the same theft-sharing agreement remains in force, and the funds ultimately reach Developer-controlled wallets.

47.    Immediately after the theft, in an effort to both hide and launder the assets, the stolen cryptocurrency is transferred through numerous disposable cryptocurrency wallets, frequently converted via decentralized cryptocurrency exchanges, bridged across various blockchains (to further complicate tracing), and ultimately deposited into accounts at centralized cryptocurrency exchanges. The exchanges then automatically place the stolen cryptocurrency into the exchange's "hot wallet" (or centralized pool of assets), resulting in further obfuscation of the funds.

48.    Through these methods, the Inferno Drainer racketeering enterprise intentionally fragments and disperses each theft across different jurisdictions and asset classes (such as different types of cryptocurrency or NFTs[6]). This money-laundering strategy creates a lengthy transaction chain, which deliberately obscures ownership, hinders asset tracing efforts, and significantly complicates the efforts of courts attempting to freeze or recover the proceeds of the fraud.

**C. Plaintiff's Forensic Tracking of Their Stolen Cryptocurrency**

49.    To identify the Defendants and trace the stolen cryptocurrency, Plaintiff retained blockchain forensics experts Sayfer Forensics ("Sayfer"). A blockchain intelligence report by Sayfer is attached as Exhibit A. Plaintiff incorporates Exhibit A into his verified complaint, and the pled facts regarding Inferno Drainer, the theft that underlies this case, and the specific wallet numbers identified as part of the Inferno Drainer scheme are set forth in greater detail therein.

---

[6] A non-fungible token (NFT) is a unique digital identifier that is recorded on a blockchain and is used to certify ownership and authenticity.

10

50.     Blockchain technology is a type of database or ledger that records information in linked blocks across a distributed network. By design, the three core pillars of blockchain technology are decentralization, transparency, and immutability; thus, blockchain is expressly designed to be traceable; for example, when a transaction is made, it is recorded on the blockchain and assigned a "transaction ID" ("TXID"). A TXID is a unique string of characters assigned to every verified transaction and stored in the blockchain. The TXID is used to uniquely identify a particular transaction, verify that it occurred, and make the transaction searchable in the database. Similarly, cryptocurrency wallets and smart contracts are assigned a unique and unalterable string of digits.

51.     To search for transactions, blockchain explorers are used. A Blockchain explorer is a publicly available search engine for the ledger, which allows investigators to look up every transaction that has ever been recorded on the blockchain along with details such as the wallet addresses involved in the transaction, what tokens (or cryptocurrencies) were transferred, what smart-contract was deployed to effectuate the transaction, as well as what day and time the transaction occurred.  Every entry in the blockchain database is time-stamped and immutable, allowing investigators to develop a definitive audit trail that verifies exactly when a transaction was authorized, which contract or wallet received the assets, and how those assets were subsequently transferred.

52.     To begin the tracing, Sayfer Forensics first isolated the transaction hashes associated with the initial unauthorized withdrawal of approximately 4,855,702.06 TSUKA tokens (then valued at approximately $166,800) from Mr. Reed's wallet address 0xaB7473Da0af4658AE2879cB641d82E7652721486.

53.     Using blockchain explorers such as Etherscan.io and Metasleuth, Sayfer located the relevant transaction records, including TXID 0x779b55a98bdb1e7b9a3971219cb18a3ad00d58b6cf742dd5f841b660a3ded882 and TXID 0x62fc279c4c7c05cd819ea47758eecf7fbb146a786103d3aed735a7825c4b378b.

54.     The records confirmed that Plaintiff's wallet transmitted his TSUKA tokens to addresses under the control of Defendants, including but not limited to 0x228bd0b1640c2f8d2eda9d7af1bec55bc49fb0a6 and 0x29488E5fD6bF9B3cc98A9d06A25204947ccCBE4D.

55.     Upon further analysis, Sayfer verified that the transactions bore the hallmarks of the Inferno Drainer scheme, including interaction with the known Inferno Drainer contract caller 0x0000db5c8B030ae20308ac975898E09741e70000.

56.     In this transaction, Plaintiff was deceived by Defendants operating under the Inferno Drainer scheme. Plaintiff clicked a fraudulent hyperlink sent from his friend's compromised device, which led to a counterfeit website designed to mimic a legitimate cryptocurrency interface.

57.     Upon connecting his wallet, the site's malicious smart contract (Contract ID: 0x0000db5c8B030ae20308ac975898E09741e70000) accessed Plaintiff's compromised wallet and withdrew all the Plaintiff's tokens.

58.     When Plaintiff connecting his wallet to the fraudulent site, that action triggered the hidden smart contract, enabling Defendants to execute withdrawals of assets from Plaintiff's wallet without his knowledge or consent.

59.     By express design, the malicious smart contract drained approximately 4,855,702.06 TSUKA tokens, valued at approximately $166,800 USD, from Plaintiff's wallet

(0xaB7473Da0af4658AE2879cB641d82E7652721486) and transferred the entire amount to

scam-controlled addresses, including 0x228bd0b1640c2f8d2eda9d7af1bec55bc49fb0a6 and

0x29488E5fD6bF9B3cc98A9d06A25204947ccCBE4D.

60.    Transaction records (e.g., TXID

0x779b55a98bdb1e7b9a3971219cb18a3ad00d58b6cf742dd5f841b660a3ded882) confirm that

the malicious smart contract was launched and executed by the wallet

0x0000db5c8B030ae20308ac975898E09741e70000, identified by industry sources as an

"executor" wallet of Inferno Drainer.

61.    Utilizing blockchain data compiled in Dune Analytics and confirmed by third-

party investigation firms such as ScamSniffer, Sayfer Forensics identified this executor wallet as

the controlling wallet responsible for initiating the fraudulent transaction and paying the required

"gas fee" (a small amount of ETH necessary to validate and record the transaction on the

Ethereum blockchain).

62.    The Inferno organization then transferred the cryptocurrency through their

network of Inferno Drainer wallets via a series of "hops" designed to obfuscate the audit trail,

facilitate asset laundering, and hinder asset tracing.

63.    Sayfer traced the network of wallets using well-known and reputable asset tracing tools

such as Arkham and Metasleuth, and was able to identify deposits into major centralized

exchanges. Recently Sayfer was able to obtain further information regarding the movement of

Plaintiff's stolen funds through several exchanges, including two US based exchanges:

Crypto.com and Bianance. These movements of Plaintiff's stolen cryptocurrency are identified

in Exhibit A, and the funds ultimately were deposited within wallets identified as belonging to

John Doe Number 3–9, i.e., wallet numbers:

| a | 0x80636DeF1134D300d81fE51440595131B3E52579 |
| b | 0x57CD4542C0C997c3E7Ee77925069C08A248FCfe0 |
| c | 0xb524979bEb95B261FF5EECFB2D063f5f9e2d9Bf8 |
| d | 0x6F188d5FFCB60684e1E81aCbD10b52de42cf901b |
| e | 71QALeMW6L5NEcqNsu1JKzHqaie52BfTnTZ4hjqLeW2H |
| f | 0xEbC6fd7B731A4c553B5f437F3A0c77B0a2A281b1 |
| g | 0x3846c5abD10F3931A0A99156Ba80D4ff10999E0A |

**D. Damages**

64.     As a result of the Defendants' actions, Plaintiff has suffered damages, including but not limited to:

> (a) $166,800 USD;
>
> (b) Lost profits;
>
> (c) Interest; and
>
> (d) Costs and Expenses.

65.     Plaintiff has suffered additional damages that will be proven at trial.  These include but are not limited to the psychological distress inflicted on him by the theft of his life savings.

66.     Plaintiff has performed all of its duties and obligations; any conditions precedent to Plaintiff bringing this action have occurred, have been performed, or have been excused or waived.

67.     Due to the complexity of the efforts to conceal the stolen funds, Plaintiff has been obligated to retain an expert, Sayfer, and is obligated to pay a reasonable fee for its services.

14

68.     To enforce its rights, Plaintiff has retained undersigned counsel and is obligated to pay counsel a reasonable fee for services.

## COUNT I: RACKETEERING IN VIOLATION OF 18 U.S.C. § 1962(C)

### Against All Defendants

69.     Plaintiff adopts and realleges the allegations set forth in paragraphs 1 through 68 above, as if fully and expressly set forth herein, and further alleges as follows:

70.     JOHN DOE(s) 1–13 (collectively, the "Defendants") constituted an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), in that they are a group of individuals and legal entities associated in fact. Their enterprise is referred to herein as the "Inferno Drainer."

71.     Inferno Drainer is an organization specifically built around a scheme to intentionally defraud victims of their crypto assets by tricking victims into connecting their wallets to websites that contain malicious software on false pretenses onto a computer or device.

72.     The operation has two tiers: the Inferno Drainer Developers, who develop, maintain, and deploy the phishing and scamming software, and the frontline Accomplices who lure victims to the spoofed or fake websites through various phishing tactics. The developers advertise an 80/20 split where the Accomplices keep roughly 80 percent of each theft, and the developers receive the remaining 20 percent for providing the tools.

73.     The Accomplices lure victims by posting links on trusted and well-known channels within social media platforms, such as X or Telegram, directing them to websites that mimic well-known crypto platforms or projects.

15

74.     Once the victim is on the fraudulent website, they are asked to connect their digital wallets (an application that stores their crypto assets) for verification purposes, or to receive airdrops of NFTs or other tokens, a practice widely used in the crypto space.

75.     When requesting routine confirmation, the website injects a hidden approval request. When a user connects their wallet they unknowingly grant unlimited approval to Inferno Drainer's malicious smart contract which steals all the cryptocurrency tokens in a victim's wallet by transferring them to Inferno Drainer wallets.

76.     Over the last few years, the Inferno Drainer Enterprise engaged in numerous acts of wire fraud in violation of 18 U.S.C. § 1343, as described in paragraphs 11–19, *supra*.  These acts of fraud number far more than the requisite two to allege a criminal enterprise. Specifically, Defendants, acting through the Inferno Drainer Enterprise, devised and executed a scheme to defraud by transmitting fraudulent communications and malicious code by means of wire, radio, and interstate communications. Like many victims, the Plaintiff, Mr. Reed, was deceived by these fraudulent communications when members of the Inferno Drainer Enterprise, posing as his friend, sent him a message.[7]  Members of Inferno Drainer sent Reed by a fraudulent hyperlink, which directed Reed to a counterfeit website controlled by Defendants. In reliance on this fraudulent communication and the appearance of legitimacy, Plaintiff connected his digital wallet to the website. As a direct result, Defendants were able to gain unauthorized access to Plaintiff's wallet and stole approximately 4,855,702.06 TSUKA tokens, valued at approximately $166,800.00 USD, which were subsequently laundered through intermediary wallets and into cryptocurrency exchange accounts.

---

[7] As detailed *supra*, Inferno Drainer members had illegally accessed this friend's phone by installing a SIM card to which they had access.

77.     Inferno has facilitated over 16,000 unique phishing domains, impersonated more than 100 cryptocurrency brands, and is responsible for stealing over $130 million in crypto assets.

78.     For all of the above acts of wire fraud, the Defendants voluntarily and intentionally devised or participated in a scheme to defraud another out of their money. The intention of all of the Defendants was to participate in a scheme to defraud others out of monies. It was reasonably foreseeable that interstate wire communications would be used; and interstate wire communications were in fact used.

79.     The Inferno Drainer Enterprise also engaged in money laundering in violation of 18 U.S.C. §§ 1962(a), in connection with 18 U.S.C. §§ 1956 and 1957. As detailed *supra*, they did so by transferring the stolen 4,855,702.06 TSUKA tokens through multiple intermediary wallets in layered transactions designed to conceal the source and ownership of the assets, before ultimately depositing them into centralized exchange accounts under their control. These transactions were intentionally structured to disguise the illicit origin of the funds and promote the continued operation of the Inferno Drainer Enterprise. Further blockchain analysis revealed that Defendants have repeatedly used the same laundering techniques in connection with other victims' stolen assets, demonstrating that this was not an isolated incident but part of an ongoing pattern of money laundering designed to sustain the criminal enterprise.

80.     Once the transfer of stolen assets is triggered, typically the malicious smart contract automatically divides the stolen assets 80/20 between the Accomplices and the Developers, but in all cases the stolen tokens are sent to wallets controlled by Inferno Drainer members.

81.     The stolen tokens are then laundered using a series of money laundering methods to obscure the trail, and evade international "know your customer" (KYC) and anti-money laundering (AML) requirements.

82.     Immediately after a drain, the stolen tokens are routed through dozens of short-lived "peeling-chain" wallets, a laundering tactic in which stolen funds are passed through multiple newly created wallets, each time "peeling" off smaller amounts to obscure the trail by creating multiple new trails with stolen assets to be traced. All the assets now divided into multiple wallets with their own trails are then either swapped into other cryptocurrencies on decentralized exchanges, bridged, or transferred across multiple blockchains. These assets are also fragmented into sub-$100,000 tranches timed to avoid automatic compliance flags.[8] The funds are next deposited into unique deposit addresses within multiple centralized exchanges and, within minutes, swept into the exchange's omnibus "hot-wallets," where they are commingled with billions of dollars in other customer assets—thereby obscuring their origin and owner.[9]

83.     Finally, the assets are deposited into accounts in large centralized exchanges, where they can be further obscured, as without a court order or subpoena, it is impossible to trace assets are deposited in an exchange's central pool of funds. This allows the scammers to either convert the stolen tokens into traditional money or further obfuscate their trails by transferring into other exchanges or wallets to obscure the illicit origin of the money and facilitate its movement across borders

---

[8] **Checkpoint Research**, *Inferno Drainer: Anatomy of a $70 Million Phishing Enterprise* (Nov. 2023) (detailing peeling-chain hops, DEX swaps, and cross-chain bridges).
[9] **Group-IB**, *Crypto Drainers—The New Frontier of Organized Cybercrime* 7–9 (Apr. 2024) (documenting Binance deposit tactics and omnibus sweeps).

84.     This activity intentionally promotes the carrying on of the unlawful activity and core purpose of the Inferno Drainer enterprise, defrauding persons of their funds, while it also intends to conceal the location, ownership, and control of the proceeds of the unlawful activity.

85.     Funds are also apportioned within the RICO organization; approximately twenty percent (20%) of the defrauded funds are sent to the software designers, with the remainder retained by the other front-line fraudsters.

86.     There is no legitimate reason for the number of transfers, the types of transfers, and the separation of the amounts, except to conceal the location, ownership, and control of the proceeds of the unlawful activity.

87.     These wrongful acts affect interstate commerce both financially and through the use of emails. These acts show a continuous pattern of racketeering activity.

88.     The Defendants are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c). Each of them individually conducted, participated in, engaged in, and operated and managed the affairs of the Inferno Drainer through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire fraud and money laundering described above.

89.     All the acts of racketeering activity described above were related so as to establish a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c). The Defendants' common purpose was to defraud Hayden Reed and other victims and convert and exercise dominion and control over those victims' assets.

90.     Each Defendant, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission.

91.     The Inferno Drainer Enterprise was (and is) of sufficient longevity for its members to carry out their purposes on a large scale. All of the acts of racketeering described above, were continuous so as to form a pattern of racketeering activity in that the Defendants have engaged in the predicate acts for a substantial period of time, exceeding one year. It is common knowledge that the Inferno Drainer Organization has stolen approximately $ 80 - $ 120 million worth of assets since its inception.

92.     As a direct and proximate result of, and by reason of, the activities of the Defendants and their conduct in violation of 18 U.S.C. § 1962(c), Hayden Reed was injured in its business and property within the meaning of 18 U.S.C. § 1962(c).

WHEREFORE, Plaintiff Hayden Reed demands that judgment be entered against Defendants JOHN DOE(s) 1–13, jointly and severally, for damages, interest, costs, expenses, and such other and further relief as this Court deems just and proper. Pursuant to 18 U.S.C. § 1964(c), entitled to recover threefold the damages sustained, plus the cost of the suit, including reasonable attorneys' fees and experts' fees.

## COUNT II: RACKETEERING IN VIOLATION OF 18 U.S.C. § 1962(D)
### Against All Defendants

93.     Plaintiff adopts and realleges the allegations set forth in paragraphs 1 through 68 above, as if fully and expressly set forth herein, and further alleges as follows:

94.     JOHN DOE(s) 1–13, (collectively, the "Defendants") knowingly and willfully conspired with each other and others to conduct and participate, directly and indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

95.     The Defendants agreed to and did facilitate the operation of an enterprise—referred to herein as the "Inferno Drainer"—which engaged in a pattern of racketeering activity, including multiple acts of wire fraud in violation of 18 U.S.C. § 1343, and money laundering in violation of 18 U.S.C. §§ 1956 and 1957, as described, *supra*.

96.     Each of the Defendants was aware of the essential nature and scope of Inferno Drainer's fraudulent scheme and agreed to further its illegal purposes. Specifically, each Defendant knowingly entered into an agreement to facilitate the fraudulent theft of funds from victims like Reed and others through false representations and fraudulent digital transactions.

97.     The Defendants each took overt acts in furtherance of their conspiracy, including but not limited to:

(a)  Stealing SIM card information in order to lure Mr. Reed into engaging with a fraudulent online platform;

(b)  Operating and maintaining fraudulent online platforms, including the websites used to lure victim into this scheme;

(c)  Using emails and other digital communications to perpetrate the fraud, such as sending Mr. Reed fraudulent information to entice him to log onto the fraudulent online platform;

(d)  Stealing the victim's funds;

(e)  Laundering those stolen funds through exchanges and other financial institutions to conceal the stolen money's origins; and,

(f)  Coordinating their efforts to ensure the continued success and profitability of the Inferno Drainer Enterprise.

98.     The Defendants' conspiracy had the common purpose of defrauding and stealing from Mr. Reed and other victims and then laundering the stolen funds through cryptocurrency and financial transactions to evade detection.

99.     As a direct and proximate result of, and by reason of, the Defendants' conspiracy to violate 18 U.S.C. § 1962(c), Hayden Reed suffered injury to his business and property within the meaning of 18 U.S.C. § 1964(c).

WHEREFORE, Plaintiff Hayden Reed demands that judgment be entered against Defendants JOHN DOE(s) 1–13, jointly and severally, for damages, interest, costs, expenses, and such other and further relief as this Court deems just and proper. Pursuant to 18 U.S.C. § 1964(c), entitled to recover threefold the damages sustained, plus the cost of the suit, including reasonable attorneys' fees and experts' fees.

## COUNT III: VIOLATION OF 18 U.S.C. § 1030(a)(2)(C), 1030(a)(4), and 1030(a)(5)(C)
### (COMPUTER FRAUD AND ABUSE ACT ["CFAA"])
### Against All Defendants

100.     Plaintiff adopts and realleges the allegations set forth in paragraphs 1 through 68 above, as if fully and expressly set forth herein, and further alleges as follows:

101.     This cause of action asserts a claim against JOHN DOE(s) 1–13 for violations of 18 U.S.C. § 1030(a)(2)(C), 1030(a)(4), and 1030(a)(5)(C) (the "Computer Fraud and Abuse Act") for unauthorized access to a protected computer to obtain information, for knowingly doing so with an intent to defraud, for furthering fraudulent activity thereby to obtain something of value, and for intentionally accessing a protected computer without authorization and causing Plaintiff damage or loss.

102.     Plaintiff's computer is a "protected computer" as defined in 18 U.S.C. § 1030(e)(2)(B) because it is used in interstate or foreign commerce or communication, including sending and receiving electronic mail, and accessing and interacting with the internet.

103.     JOHN DOE(s) 1-13, without authorization, accessed -- knowingly and with intent to defraud Plaintiff -- a protected computer (i.e., Plaintiff's computer).

104.     As a result of his unauthorized access to Plaintiff 's computer, JOHN DOE effected a theft of Plaintiff's cryptocurrency.

105.     In addition, JOHN DOE(s) 1-13 intentionally accessed Plaintiff 's protected computer without authorization; and as a result of such conduct, caused Plaintiff damage or loss.

106.     As a consequence of JOHN DOE(s) 1-13's unauthorized access to Plaintiff's computer the private information maintained in connection therewith, Plaintiff has suffered damage far in excess of Five Thousand Dollars ($5,000.00).

WHEREFORE, Plaintiff Hayden Reed demands entry of a judgment against Defendants JOHN DOE(s) 1-13, jointly and severally, for damages, including compensatory damages, punitive damages, interest, expenses, and any other relief the Court deems just and proper.

## COUNT IV : IMPOSITION OF CONSTRUCTIVE TRUST
## AND DISGORGEMENT OF FUNDS
### Against All Defendants

107.     Plaintiff adopts and realleges the allegations set forth in paragraphs 1 through 68 above, as if fully and expressly set forth herein, and further alleges as follows:

108.     This is an action to impose a constructive trust upon the property taken from Plaintiff that is currently held by Defendants JOHN DOE(s) 1-13.

109.     This action further calls for the restoration to Plaintiff of that wrongfully obtained property.

110.     As set forth above, Defendants—through actual fraud, misappropriation, conversion, theft, or other illegal means—obtained Plaintiff's cryptocurrency, which in equity and good conscience Defendants should not be permitted to hold.

111.     As set forth in Exhibit A, the cryptocurrency assets at issue are specific identifiable property and have been traced to Defendant's wallets.

112.     Any and all assets being held by Defendants in these wallets, or held in other wallets owned by Defendants at exchanges must be held in trust for Plaintiff's benefit, as Defendants is not entitled to the benefit of wrongfully misappropriated, converted and stolen cryptocurrency assets that were taken from Plaintiff.

113.     The digital assets identified herein which are being held by Defendants must be disgorged to Plaintiff's benefit, as Defendants are not entitled to the benefit of wrongfully misappropriated, converted, and stolen cryptocurrency assets that were taken from Plaintiff.

WHEREFORE, Plaintiff Hayden Reed demands the equitable imposition of a constructive trust over the property taken from Plaintiff that is currently under the control of Defendants JOHN DOE(s) 1-13, in the cryptocurrency wallets identified in this complaint, and further demands that the wrongfully obtained property be returned to Plaintiff.

## COUNT V: REPLEVIN

## Against All Defendants

114.     Plaintiff adopts and realleges the allegations set forth in paragraphs 1 through 68 above, as if fully and expressly set forth herein, and further alleges as follows:

115.     This is an action to recover possession of personal property.

24

116.    The property at issue is 4,855,702 tokens of TSUKA cryptocurrency.

117.    Upon information and belief, the U.S. Dollar equivalent value of the personal property as of the date of theft is approximately valued at One Hundred Sixty-Six Thousand, Eight-Hundred Dollars. ($166,800).

118.    As of the date of this filing, the personal property at issue is believed to be stored in wallets identified in this complaint that are owned or controlled by Defendants JOHN DOE(s) 1-13.

119.    Plaintiff owned and had the right to immediately possess the personal property— not just a mere right to payment for the value of those cryptocurrencies—that was taken from him.

120.    JOHN DOE(s) 1-13 have intentionally exercised control, and continue to exercise control, over the cryptocurrencies in such a way as to exclude Plaintiff from using or possessing them.

121.    The Plaintiff's property has not been taken for any tax, assessment or fine pursuant to law, nor has it been taken under an execution or attachment against Plaintiff's property.

WHEREFORE, Plaintiff Hayden Reed demands replevin of the property taken from Plaintiff that is currently held by Defendants, JOHN DOE(s) 1–13, and demands that the wrongfully obtained property be restored to Plaintiff.

## COUNT VI: CONVERSION

### Against All Defendants

122.    Plaintiff adopts and realleges the allegations set forth in paragraphs 1 through 68 above, as if fully and expressly set forth herein, and further alleges as follows:

123.     Defendants, JOHN DOE(s) 1–13, misappropriated Plaintiff's cryptocurrency funds without Plaintiff's consent or permission.

124.     Defendants converted Plaintiff's funds to their own use or to the use of others not entitled thereto and have exercised dominion and control over the funds to Plaintiff's exclusion and detriment.

125.     Plaintiff has suffered damages as a direct and proximate result of Defendants' conversion.

WHEREFORE, Plaintiff Hayden Reed demands that judgment be entered against Defendants JOHN DOE(s) 1–13, jointly and severally, for damages, interest, costs, expenses, and such other and further relief as this Court deems just and proper.

## COUNT VII: UNJUST ENRICHMENT

### Against All Defendants

126.     Plaintiff adopts and realleges the allegations set forth in paragraphs 1 through 68 above, as if fully and expressly set forth herein, and further alleges as follows:

127.     Plaintiff conferred a direct benefit upon Defendants in the form of the cryptocurrency that Defendants converted from Plaintiff.

128.     Defendants have knowledge of the benefit Plaintiff conferred upon them and have retained such benefit.

129.     The circumstances under which Plaintiff conferred, and Defendants accepted, such benefit render Defendants' retention of the benefits inequitable.

130.     Equity requires that Defendants return to Plaintiff the benefits conferred upon Defendants.

WHEREFORE, Plaintiff Hayden Reed demands that judgment be entered against Defendants JOHN DOE(s) 1–13, jointly and severally, for damages, punitive damages, interest, costs, expenses, and such other further relief as this Court deems just and proper.

## COUNT IIX: CIVIL CONSPIRACY

### Against All Defendants

131.    Plaintiff adopts and realleges the allegations set forth in paragraphs 1 through 68 above as if fully and expressly set forth herein and further alleges as follows.

132.    The Defendants, JOHN DOE(s) 1–13, conspired and confederated with each other to commit, and committed, Conversion (Count VI); and Unjust Enrichment (Count VII).

133.    Plaintiff has suffered damages as a direct and proximate result of Defendants' conspiracy.

WHEREFORE, Plaintiff Hayden Reed demands that judgment be entered against Defendants JOHN DOE 1–13, jointly and severally, for damages, punitive damages, interest, costs, and such other and further relief as this Court deems just and proper.

### DEMAND FOR A JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

### RESERVATION OF RIGHTS

Plaintiff reserves its right to further amend this Complaint, upon completion of its investigation and discovery, to assert any additional claims for relief against Defendants or other parties as may be warranted under the circumstances and as allowed by law.

Dated: September 27, 2025                    Respectfully submitted,

/s/    *Robert J. McCaffery, Jr.*
ROBERT J. MCCAFFERY, JR., FBN 48136
r.mccaffery@ibl.law

/s/    *Alexander Rodriguez*
ALEXANDER RODRIGUEZ, FBN 123054
a.rodriguez@ibl.law

INDUSTRIA BUSINESS LAWYERS LLP
601 Pennsylvania Ave., N.W.
South Building, Suite 900
Washington D.C., 20004
Phone: (202) 495-1185

**Attorneys for Plaintiff**

**<u>VERIFICATION</u>**

I, Hayden Reed hereby declare under penalty of perjury that I have read the foregoing VERIFIED
COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF and verify that all statements herein are true and
correct to the best of my knowledge, understanding, and belief.

Dated: September 25, 2025

Hayden Reed